**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2522-23

RONALD TARAKJI,

      Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

      Respondent.

_____

Argued December 4, 2025 – Decided January 13, 2026

Before Judges Marczyk and Bishop-Thompson.

On appeal from the New Jersey State Parole Board.

Joseph J. Russo, Assistant Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Joseph J. Russo, of counsel and on the briefs; Alicia J. Hubbard, Assistant Deputy Public Defender, on the brief).

Leo Boerstoel, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Handel T. Destinvil, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Ronald Tarakji appeals from the February 28, 2024 final agency decision of the New Jersey State Parole Board (Board) revoking his parole and ordering him to serve a sixteen-month term of incarceration for violating conditions of his parole supervision for life (PSL). Following our review of the record and applicable legal principles, we affirm.

I.

We glean the pertinent facts from the record before the Board. On February 17, 2011, Tarakji was sentenced to a four-year term of incarceration for aggravated sexual assault and criminal sexual contact involving an incapacitated victim. He was paroled in August 2012 and commenced his PSL term at that time. Thereafter, Tarakji violated his parole conditions several times prior to the violation at issue in this appeal.

In April 2015, the Board found by clear and convincing evidence Tarakji had violated the following conditions of his PSL: report to his assigned parole officer as instructed; reside at a residence approved by his assigned parole officer; and obtain permission of his assigned parole officer prior to any change of residence. Tarakji's parole was revoked, and he was sentenced to a term of incarceration of twelve months.

A-2522-23

After recommencing PSL in July 2015, Tarakji again violated multiple conditions of his parole, but a two-member Board panel allowed him to remain on parole subject to additional conditions, including completion of the Stages to Enhance Parolee Success (STEPS) program.[1]  Tarakji was also afforded the opportunity to attend the alternative to incarceration Reentry Substance Abuse Program (RESAP)[2] but later was found in possession of a prohibited substance. Accordingly, in June 2017, a two-member Board panel revoked Tarakji's parole and sentenced him to a fourteen-month term of incarceration.

In mid-2018, Tarakji again commenced PSL.  In July 2018, he was referred to the Community Resource Center (CRC)[3] due to a lack of stable

---

[1]  The STEPS program provides parolees a network of community-based residential programs and specialized, supportive reentry services to assist them in transitioning to the community.  See Division of Community Programs, N.J. State Parole Bd., https://www.nj.gov/parole/functions/community-programs (last visited Dec. 23, 2025).

[2]  RESAP offers a structured alternative to re-incarceration for parolees who have violated the conditions of their parole and experienced a substance abuse relapse.  See Division of Community Programs, N.J. State Parole Bd., https://www.nj.gov/parole/functions/community-programs (last visited Dec. 23, 2025).

[3]  CRCs are non-residential programs that provide a number of services to offenders in need of education, employment, life skills, substance abuse counseling, and other related programming.  See Division of Community Programs, N.J. State Parole Bd.,

A-2522-23

employment. Tarakji failed to consistently attend the CRC program, resulting in his discharge. Thereafter, he was referred to the STEPS program, which he successfully completed in October 2018. However, in November 2018, Tarakji was found to not be residing at his address on record and was again referred to the CRC program. In July 2019, he was discharged from the CRC program for threatening a staff member. During a follow-up investigation, it was found Tarakji had also created and operated a social media account in violation of his PSL. He was then returned to custody for serious and persistent violations of his PSL.

A hearing was conducted in November 2019, where the hearing officer found Tarakji had violated two conditions of his PSL: (1) participate in and successfully complete an appropriate community or residential counseling or treatment program as directed by the assigned parole officer; and (2) refrain from using any computer or device to create a social networking profile or to access any social networking service. Nevertheless, a panel subsequently decided not to revoke Tarakji's PSL status. He was continued on PSL, directed

---

https://www.nj.gov/parole/functions/community-programs (last visited Dec. 23, 2025).

to complete another STEPS program, and required to enroll in the global positioning system (GPS) monitoring program.

Tarakji successfully completed the STEPS and GPS monitoring programs. However, after completing these programs, he "made no attempts to obtain employment and refused to attend sex offender counseling . . . and outpatient drug counseling." Additionally, Tarakji admitted to using marijuana. He was again referred to a STEPS program in February 2021, but he "adamantly refused" to be admitted to the program and stated he would "rather be locked up instead," which resulted in him being arrested for violation of his PSL. In May 2021, a panel found Tarakji violated the condition to "participate in and successfully complete an appropriate community or residential counseling or treatment program as directed by the assigned parole officer." However, the panel ultimately determined Tarakji would continue on PSL status and complete the STEPS program.

In September 2022, Tarakji's parole officer referred him to a CRC program as a general condition of his parole because his employment history had been sporadic. He failed to adequately participate in the CRC program, and, in January 2023, he was placed on a thirty-day behavioral contract. Tarakji continued to fail to comply with the rules and regulations of the CRC program.

Thus, in February, he was discharged from the CRC program because of his "numerous absences from the program" and his failure to "make any progress towards proof of on the books, legal employment."

In February 2023, Tarakji's parole officer referred him to the STEPS program at the Kintock Group (Kintock), a residential program in Newark he believed would assist Tarakji in "making a successful reintegration into the community." Notably, on February 26, 2023, Tarakji was involved in an incident at Kintock that is the subject of this appeal. On that day, another resident was allegedly smoking in the bathroom, and a resident supervisor, Emanuel Ajidahun, advised the resident to exit the bathroom, after which the resident came out with a lit "smoking substance." The supervisor asked the resident to give him the substance. At that point, Tarakji came out of his room, across the hall from the bathroom, and told the resident not to turn over the substance because the resident would be written up if he did. The resident then cut off the lit end of the substance and flushed it down the toilet. Tarakji threatened the supervisor that if the supervisor "report[ed] the inciden[t] to . . . management and [Tarakji or the other resident was] . . . sent back to jail," Tarakji would "make sure" the supervisor was "dealt with outside" when the supervisor exited the building after his shift ended. Ajidahun would later testify he felt

6

threatened by Tarakji's statements. As a result, Tarakji was discharged from the STEPS program in violation of his PSL.

Tarakji was assigned counsel on March 17, 2023. Approximately three months later—on June 12, 2023— Tarakji's counsel emailed the Board staff requesting a copy of the video surveillance of the Kintock incident. On June 15, 2023, the chief of the Board's Revocation Unit replied to Tarakji's counsel, stating:

> After reviewing your requests, please be advised that the Division of Parole [(Division)] attempted to obtain the . . . video footage from [the] facility where your client was enrolled[,] and the Division was notified by program staff that the video footage does not exist.
>
> Additionally, as these proceedings are administrative proceedings, the rules of evidence do not apply.

The chief later clarified, "the [Kintock] facility does have video surveillance, however, the video [footage] pursuant to your request[] no longer exists."

Thereafter, the hearing officer conducted a remote hearing in which he found Tarakji had violated his PSL by being discharged from the CRC program in February 2023 and the Kintock STEPS program in March 2023. Tarakji's parole officer, Vilmary Lopez, Ajidahun, and Tarakji testified at the hearing. At the beginning of the hearing, Tarakji's counsel advised the hearing officer

7

neither he nor Tarakji could see Lopez or Ajidahun on the Teams conference, but they could hear the witnesses. Counsel noted, "to the extent that there may be a constitutional issue regarding the right to face one's accuser[,] I would just note that objection on the record." However, counsel did not request for the hearing to be delayed or for an adjournment of the hearing until the issue could be resolved. Rather, he stated after making his objection, "in light of the desire to move forward[,] we are willing to proceed at this [time] w[hile] reserving that objection." Counsel also requested a dismissal of the parole violation charges because the Board failed to preserve the video surveillance. In the alternative, counsel contended the Board failed to demonstrate Tarakji's parole violations were severe and persistent.

The hearing officer subsequently rendered a written decision, finding the testimony provided by Lopez and Ajidahun was credible while Tarakji's testimony lacked credibility. He further stated, "[Tarakji]'s behavior [wa]s not only aggressive and threatening, but it also . . . compromise[d] the safe and rehabilitative atmosphere [of] the [Kintock] program." After reviewing Tarakji's parole history, the hearing officer noted Tarakji had "continue[d] to demonstrate behaviors that directly mirror[ed] his non[-]compliance during his prior terms of PSL." Accordingly, the hearing officer recommended Tarakji's

A-2522-23

PSL status be revoked and for a sixteen-month term of incarceration to be imposed. The two-member Board panel concurred with the findings of the hearing officer and ordered Tarakji to serve a sixteen-month prison term.

Tarakji appealed the panel's decision to the full Board. The Board issued a Notice of Final Agency Decision on February 28, 2024. It rejected Tarakji's confrontation clause argument, noting, in part, Tarakji had agreed to move forward with the hearing despite not being able to see the witnesses. The Board further found Tarakji was afforded a hearing before a neutral and detached hearing officer, and his ability to cross-examine the witnesses was not impacted. It noted the hearing officer had "the opportunity to observe and assess the testimonial demeanor of the parties and their witnesses." The Board was also unpersuaded by Tarakji's Brady[4] argument that the Division failed to preserve the video surveillance. It pointed out the Division requested the video and had been advised it was no longer available. Furthermore, the Board found, even in the absence of the video footage, there was still clear and convincing evidence in the record, the "Board panel . . . fully documented and supported its decision," and "Tarakji ha[d] seriously violated the conditions of [his PSL] status and

---

[4] Brady v. Maryland, 373 U.S. 83 (1963).

9

revocation [wa]s desirable."  The Board thus affirmed the panel's decision and directed Tarakji to serve a sixteen-month term of incarceration.

II.

Tarakji argues the Board's revocation decision should be reversed, as it was rendered in derogation of his due process rights because the Division failed to preserve the video footage of the incident, and the Board failed to draw an adverse inference based on the missing evidence.  He further asserts Giglio[5] protections should be afforded to those facing parole revocation.  Tarakji also contends the hearing officer violated his due process rights by permitting Lopez and Ajidahun to testify via audioconferencing, without good cause, which he asserts deprived him of his right to meaningfully confront the adverse witnesses. Additionally, he maintains he did not seriously or persistently violate a condition of his parole, and thus revocation was not warranted.

Our review of an agency's decision is circumscribed and deferential.  See In re Stallworth, 208 N.J. 182, 194 (2011).  We therefore accord considerable deference to the Board and its expertise in parole matters.  See Hare v. N.J. State Parole Bd., 368 N.J. Super. 175, 179 (App. Div. 2004).  "'Parole Board decisions are highly individualized discretionary appraisals,' and should only be reversed

_____

[5] Giglio v. United States, 405 U.S. 150 (1972).

10

if found to be arbitrary or capricious." Id. at 179-80 (internal citations omitted) (quoting Trantino v. N.J. State Parole Bd., 166 N.J. 113, 173 (2001)). We "must determine whether the factual finding could reasonably have been reached on sufficient credible evidence in the whole record." Id. at 179 (citing Trantino, 166 N.J. at 172). In making this determination, we "may not substitute [our] judgment for that of the agency, and an agency's exercise of its statutorily-delegated responsibilities is accorded a strong presumption of reasonableness." McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002) (internal citations omitted). Accordingly, "[t]he burden of showing that an action was arbitrary, unreasonable[,] or capricious rests upon the appellant." Ibid.

Pursuant to N.J.A.C. 10A:71-7.12(c):

> If the parolee has not been convicted of a crime committed while on parole, the purpose of the revocation hearing shall be to determine:
>
> 1. Whether, by clear and convincing evidence, the parolee has seriously or persistently violated the conditions of parole; and
>
> 2. Whether revocation of parole is desirable.

Clear and convincing evidence "persuades the fact finder 'that the truth of the contention is "highly probable."'" Hobson v. N.J. State Parole Bd., 435 N.J. Super. 377, 387 (App. Div. 2014) (quoting In re Perskie, 207 N.J. 275, 290 (2011)). "Stated differently, the evidence must be sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" Ibid. (quoting In re Purrazzella, 134 N.J. 228, 240 (1993)) (additional internal quotation marks omitted). "Implicit in that standard is a court's obligation to reverse where the evidence, viewed in the light most favorable to the agency's decision, is inadequate to meet the standard of proof." Id. at 388.

As we noted in Hobson, "[t]he Legislature did not further define the type of conduct it intended to capture within the statutory standard—'seriously or persistently violated.'" Id. at 382. Nor did the Board "adopt[] a regulation to guide exercise of its expertise to distinguish cases in which parole should and should not be revoked." Ibid. Accordingly, this determination falls with the Board's "highly 'individualized discretionary appraisals.'" Trantino, 166 N.J. at 173 (quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 359 (1973)). In addition, under N.J.A.C. 10A:71-7.12(c)(2), the Board must determine "[w]hether revocation of parole is desirable."

## A.

Tarakji asserts the Division's failure to preserve the surveillance footage of the incident at Kintock deprived him of the right to confront evidence against him in violation of his due process rights. He claims the video could have been utilized to impeach Ajidahun, and its absence prevented the factfinder from rendering an informed decision. Tarakji maintains he asked his parole officer shortly after the incident to "run the camera back because he did not threaten staff." He also notes his assigned counsel later requested the video, but it was not preserved, impacting his ability to present his defense. As a result, Tarakji asserts he was not afforded his due process protections under Morrissey v. Brewer, 408 U.S. 471, 482, 487-89 (1972). Accordingly, he contends the Board's decision should be reversed and the case dismissed because "the Board did not have substantial evidence to support its decision."

Tarakji alternatively argues if the Board's decision is not dismissed, it must be remanded, and the hearing officer must draw an adverse inference against the Division for failing to preserve the Kintock surveillance video. The adverse inference is justified, Tarakji contends, because he requested the video, and it was potentially exculpatory evidence that could have been used to confront the State's key witness, Ajidahun. Tarakji asserts at the time he

13

requested the video surveillance, it was known the Division was alleging he had violated his PSL and was charging him with a violation, and that, even if it was not known, Tarakji's clear request sufficed to make the Division aware of his need for the evidence.

Tarakji also argues, for the first time on appeal, Giglio protections should be afforded to individuals facing parole revocation. Under Brady, the prosecution must disclose to the defense in a criminal case any exculpatory evidence in its possession. 373 U.S. at 87. In Giglio, the Supreme Court extended that holding to any evidence that could be used to impeach a prosecution witness, such as evidence the witness acted dishonestly. See 405 U.S. at 154-55.

We have noted, "there is no question but that due process applies to parole eligibility decisions[,]" however, "parole is not a part of criminal prosecution and thus the full panoply of rights accorded a criminal defendant is not applicable." Gerardo v. N.J. State Parole Bd., 221 N.J. Super. 442, 448 (App. Div. 1987). "It has consistently been recognized that the concept of due process is elusive and flexible with the procedural protections required depending upon the particular circumstances involved." Ibid. (citing N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 208-09 (1983)). Additionally, the relaxed rules of evidence

14                                                                    A-2522-23

governing an administrative hearing apply to a parole revocation hearing. See Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 250 (2008); N.J.S.A. 52:14B-10(a)(1) ("The parties shall not be bound by rules of evidence whether statutory, common law, or adopted formally by the Rules of Court. All relevant evidence is admissible, except as otherwise provided herein.").

In Morrissey, the United States Supreme Court addressed due process at a parole revocation hearing, requiring a parolee receive:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body . . . ; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.
>
> [408 U.S. at 489.]

Subsequently, this court applied those principles in State v. Morales, 120 N.J. Super. 197, 201 (App. Div. 1972) (recognizing in Morrissey, the United States Supreme Court "laid down due process requirements that must be afforded [to] a parolee before a parole board may revoke his parole"). The Board has also

15

adopted regulations affording parolees due process protections. See N.J.A.C. 10A:71-7.14.[6]

---

[6] N.J.A.C. 10A:71-7.14 provides:

> (a) It shall be the responsibility of designated Board staff to give written notice to the parolee of the time, date and place of the revocation hearing.
>
> (b) Such notice shall be served upon the parolee by personal service or by regular mail to the institution where the parolee is housed or to the parolee's address of record.
>
> (c) Such notice shall inform the parolee of the following: the purpose of the hearing; the violation(s) of parole conditions alleged; the time, date, place and circumstances of the alleged violation(s); the name(s) of any witness(es) scheduled to appear at the hearing; and the following rights to which the parolee shall be entitled at the revocation hearing:
>
>> 1. The right to appear and speak in his or her own behalf and to be aided by an interpreter, if such aid is determined to be necessary by the hearing officer.
>>
>> 2. The right to representation by an attorney or such other qualified person as the parolee may retain, or the right to representation by an attorney assigned by the Office of the Public Defender.
>>
>> 3. The right to remain silent.

We are unpersuaded by Tarakji's contention the Division did not properly preserve the Kintock video surveillance. The Division was never in actual possession or control of the surveillance footage. Rather, it was in the possession of Kintock. Furthermore, while Tarakji asserts "Parole[] destr[oyed]" the evidence, there is no support for this allegation in the record.

---

4. The right to present witnesses to testify in his or her behalf as to matters relevant to the hearing.

5. The right to have the hearing officer issue a subpoena to compel the appearance of witnesses, provided that a prima facie showing is made that the prospective witnesses will provide material testimony relevant to the alleged violation(s) of parole.

6. The right to confront and cross-examine adverse witnesses, unless the hearing officer determines that such witnesses would be subject to risk of harm.

7. The right to present documentary evidence and any other relevant material or information.

8. The right to waive such hearing.

9. The right to request postponement of such hearing.

Tarakji's attorney was assigned to him on March 17, 2023, but did not request the video from the Division until June 12, 2023. At that juncture, the Division promptly requested the video footage from Kintock but was advised it was no longer available. Moreover, Tarakji did not ask the Division to preserve the video. He merely asked his parole officer, in disputing the incident occurred, to "run the camera back."

In his reply brief, Tarakji, relying on N.J.A.C. 10A:71-2.9, asserts he did not have the ability to subpoena Kintock. N.J.A.C. 10A:71-2.9 provides "[a]ny hearing officer or Board member may issue a subpoena to compel the appearance of witnesses and the production of documentary evidence relevant to any proceedings before such hearing officer or Board member." He insists the regulations do not allow a parolee's counsel to issue subpoenas.

Following oral argument, counsel for the Board advised this court it had "suggested" at oral argument and in its brief "Tarakji could have independently subpoenaed materials and witnesses to present at his parole revocation hearing." He advised that was "inaccurate" because "N.J.S.A. 30:4-123.50(b) and N.J.S.A. 30:4-123.63(b)(4) make clear that it is the Board's responsibility to issue subpoenas at parole revocation hearings."

18

Despite the Board's supplemental letter, Tarakji's assertions regarding his inability to independently issue subpoenas is unavailing. As we noted in Hobson:

> The Legislature [has] codified procedures for revocation that require the Board to afford persons facing revocation of release status significant procedural protections. In addition to requiring proof by clear and convincing evidence, the Legislature has mandated notice of the alleged violation, a probable cause hearing, and a subsequent revocation hearing, at which the parolee has a right to confront his or her accusers, testify, present evidence, subpoena witnesses and have counsel appointed. N.J.S.A. 30:4-123.62 to -123.63.
>
> [435 N.J. Super. at 382-83 (emphases added).]

N.J.S.A. 30:4-123.63(b)(4) provides that prior to the revocation hearing, the parolee shall be given written notice of "[t]he right to testify, to present evidence and to subpoena witnesses on the parolee's own behalf, provided a prima facie showing is made that the prospective witnesses will provide material testimony." (Emphasis added). The statute does not require the Board to issue the subpoena. Furthermore, although N.J.S.A. 30:4-123.50(b) states the Board "shall . . . have the power to compel the appearance of witnesses and the production of documentary evidence[,]" it does not limit a parolee's ability to "to subpoena witnesses on the parolee's own behalf" pursuant to N.J.S.A. 30:4-123.63(b)(4).

19

Alternatively, under N.J.A.C. 10A:71-7.14(c)(5), the parolee has "[t]he right to have the hearing officer issue a subpoena to compel the appearance of witnesses." In short, Tarakji had the ability to issue a subpoena or have one issued by the hearing officer. Even if the Board is correct that "it is the Board's responsibility" to issue subpoenas, the Division promptly requested production of the video when asked by Tarakji, but the video was unavailable.

Turning to Tarakji's adverse inference argument, we observe the duty to preserve evidence arises when there is: "(1) pending or probable litigation involving the [opposing party]; (2) knowledge by the [spoliator] of the existence or likelihood of litigation; (3) foreseeability of harm to the [opposing party], or in other words, discarding the evidence would be prejudicial to [the opposing party]; and (4) evidence relevant to the litigation." Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 366 (App. Div. 1998) (citation omitted). "The criminal adverse-inference charge is analogous to the spoliation inference which may be drawn when evidence has been concealed or destroyed in civil cases." State v. Dabas, 215 N.J. 114, 140 n.12 (2013).

"Spoliation" refers to "the hiding or destroying of litigation evidence, generally by an adverse party[,]" Lanzo v. Cyprus Amax Minerals Co., 467 N.J. Super. 476, 520 (App. Div. 2021) (citation omitted), thereby interfering with the

action's proper administration and disposition, Aetna Life & Cas. Co., 309 N.J. Super. at 364. The most common civil remedy for spoliation is an adverse inference charge, which comes into play where a litigant is made aware of the destruction or concealment of evidence during the underlying litigation. Lanzo, 467 N.J. Super. at 525.

"The purpose of an adverse inference instruction is to level 'the playing field where evidence has been hidden or destroyed.'" Id. at 519 (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 401 (2001)). In other words, an adverse inference charge "balances the equities" in that the factfinder is permitted to presume the evidence the spoliator destroyed or concealed would have been unfavorable to them. Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 472 (App. Div. 2012).

Though relevant caselaw generally discusses adverse inferences in the context of civil proceedings, our court has also recognized "[i]t is well settled," that in administrative proceedings, "it is permissible for the trier of fact to draw adverse inferences." State, Dep't of L. & Pub. Safety, Div. of Gaming Enf't v. Merlino, 216 N.J. Super. 579, 587 (App. Div. 1987); see also N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 269 (App. Div. 2018)

(recognizing the factfinder in an administrative hearing may draw an adverse inference when a party declines to testify).

We are unconvinced by Tarakji's contention he was entitled to an adverse inference charge. Spoliation claims presuppose the alleged spoliator had ownership, possession, or control of the altered or missing evidence. Allis-Chalmers Corp. Prod. Liab. Tr. v. Liberty Mut. Ins. Co., 305 N.J. Super. 550, 558-59 (App. Div. 1997). As discussed previously, the Board had no such ownership or control of the surveillance in this matter. While the surveillance video was not preserved, the Board did not participate in or authorize its disposal. Additionally, in State v. Robertson, we noted the State was only obligated to produce evidence "within the possession, custody[,] or control of the prosecutor." 438 N.J. Super. 47, 68-69 (App. Div. 2014) (citation omitted). We further pointed out "the Brady disclosure obligation does not extend to documents held by a private contractor." Id. at 69. Although Robertson was decided in the context of a criminal trial, the same principles apply here.

Furthermore, as to Tarakji's Giglio argument, we note it was not raised before the Board. "Generally, an appellate court will not consider issues, even constitutional ones, which were not raised below." State v. Galicia, 210 N.J. 364, 383 (2012). "For sound jurisprudential reasons, with few exceptions, '[we]

22

decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" State v. Witt, 223 N.J. 409, 419 (2015) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)) (additional internal quotation marks omitted). Appellate courts do not "consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). The appeal here does not involve an issue regarding jurisdiction or a matter of great public importance that warrants departure from this general rule.

## B.

Next, Tarakji posits his due process confrontation rights were violated when the hearing officer permitted Lopez and Ajidahun to testify via audioconferencing. Tarakji contends he and his counsel were only able to hear the witnesses testify and were precluded from observing them, resulting in a cross-examination by his counsel that was "not meaningful" and "in derogation of [his] . . . due process rights." He points out his counsel objected on the record as to the fact they could hear but not see the witnesses.

23

In support of his argument that parolees have the right to confront and cross-examine adverse witnesses, Tarakji relies on Morrissey and N.J.A.C. 10A:71-7.14. See Morrissey, 408 U.S. at 489. Though he acknowledges N.J.A.C. 10A:71-7.13(b)[7] permits videoconferencing, he argues the Administrative Code provides no such provision for audioconferencing alone.

Tarakji contends there is no substitute for observing a witness during cross-examination because it allows counsel to evaluate credibility and uncover new information by interpreting nonverbal cues such as body language, facial expressions, and demeanor. He also asserts the violation of his rights in this regard mandated the hearing officer find "good cause" existed to proceed with the testimony of witnesses via audioconferencing, and that in the absence of such a finding, the hearing officer was required to secure a knowing, intelligent, and voluntary waiver from Tarakji.

Parolees have the right to confrontation in parole revocation hearings under Morrissey and N.J.A.C. 10A:71-7.14(c)(6). However, the right of confrontation, like other constitutional rights, may be waived. See State v. Williams, 219 N.J. 89, 93 (2014). We are satisfied, under the facts here, Tarakji

---

[7] N.J.A.C. 10A:71-7.13(b) states, "[a] revocation hearing may be conducted by videoconferencing. A record of the hearing shall be made pursuant to N.J.A.C. 10A:71-7.16(a)."

waived those rights by agreeing to proceed with the hearing despite the technical difficulties that allowed only the hearing officer to see the witnesses. Despite objecting, Tarakji's counsel stated, "in light of the desire to move forward[,] we are willing to proceed at this [time] w[hile] reserving that objection." There was never a request to delay the proceedings or for the hearing officer to address the issues regarding the video feed. Moreover, Tarakji did not request an adjournment or continuance so the matter could be heard on a different day. That is, the hearing officer was never asked to postpone or delay the hearing, and Tarakji's counsel acquiesced and specifically expressed a willingness to proceed, relinquishing Tarakji's right to visually observe the witnesses. These actions constitute a waiver under the circumstances.

C.

Lastly, Tarakji argues the Board erred in finding there existed clear and convincing evidence he seriously or persistently violated the conditions of his PSL based on the Division's failure to preserve the video surveillance. He also claims his "alleged failure" to complete the residential and non-residential Kintock programs cannot be characterized as serious or persistent because he was compliant with "all other parole conditions." Tarakji thus concludes the

25

Board's decision was arbitrary, unreasonable, or capricious, and that it must be reversed.

Guided by the principles set forth above, and based on the record before the Board, we conclude these arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only the following comments. There was ample support in the record for the Board's decision, including Tarakji's long history of parole violations, his threatening a resident supervisor at Kintock, and his unsuccessful discharge from the STEPS program. We therefore conclude the Board's decision was not arbitrary, capricious, or unreasonable. See Trantino, 166 N.J. at 173. Pursuant to our limited standard of review, we affirm the Board's well-reasoned final decision, which "is supported by sufficient credible evidence on the record as a whole." R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division